UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA CRISCO, et al.,

    Plaintiffs,

    v.

FOREMOST INSURANCE COMPANY GRAND RAPIDS, MICHIGAN, et al.,

    Defendants.

No. C 19-07320 WHA

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

# INTRODUCTION

In an insurance coverage dispute arising out of the Tubbs Fire in 2017, this order rules against the insurance company and in favor of the fire victims.

# STATEMENT

The parties stipulate to the following facts (Dkt. No. 43). Until the fire, our ten plaintiffs owned and resided in ten mobile homes at Journey's End Mobile Home Park in Santa Rosa. Defendants Foremost Insurance Company Grand Rapids, Michigan and Foremost Property and Casualty Insurance Company (collectively, Foremost) insured plaintiffs' dwellings. The relevant terms are the same under each of the ten policies.

**1.    THE POLICIES.**

The policies protected three types of property: (A) the dwelling, (B) other structures, and (C) personal property. Only coverage A is at issue:

> Coverage A — Dwelling
>
> We insure:
>
>> 1. Your dwelling that is described on the Declaration Page.
>>
>> 2. Materials and supplies for use in the construction, alteration or repair of your dwelling located within or immediately adjacent to your dwelling.
>>
>> 3. Any structure you own that is attached to your dwelling, other than a structure attached only by a fence, utility line or similar connection."

The insuring provision stated:

> We insure risk of *direct, sudden and accidental physical loss to the property* described in Coverage A — Dwelling, Coverage B — Other Structures and Coverage C — Personal Property unless the loss is excluded elsewhere in this policy.

Foremost initially relied on an exclusion for government action but later abandoned reliance on the exclusion.

For loss to the insured's dwelling, the applicable payment method turned on whether the loss was total or partial. Only total loss is relevant here:

> A total loss occurs when your dwelling is damaged beyond reasonable repair.
>
> When a total loss occurs, your loss will be equal to the Amount of Insurance shown on the Declaration Page.

Separate from coverage for the three types of property, the policies also included:

> Coverage D — Additional Living Expenses
>
> If an insured loss makes your premises not fit to live in, we will pay the actual, reasonable and necessary increase in your living expense to maintain your normal standard of living while you live elsewhere. We will pay for the shortest time needed:
>
>> 1. To repair or replace the damaged property.
>>
>> 2. For you to permanently relocate.
>
> The total amount we will pay will not exceed the Amount of Insurance described on the Declarations Page for Coverage D — Additional Living Expense.
>
> If damage caused by an Insured Peril occurs at neighboring premises, we will pay reasonable additional living expenses for up to two weeks should civil authorities prohibit occupancy of your premises.

2. **THE FIRE.**

When the fire occurred in October 2017, local officials ordered residents to evacuate. The fire burned 117 of the 160 mobile homes at the park and destroyed the electric, gas, sewer, and potable water infrastructure which serviced plaintiffs' mobile homes. That infrastructure was owned and controlled by the mobile home park owners. The parties agree to, and swear that, "[a]s a direct result of the fire, the insureds' homes lost access to running water, sewage, electricity, gas, and heat." The parties dispute whether and to what extent plaintiffs' mobile homes suffered any direct damage from the fire (Stip. Facts ¶¶ 12–14).

Shortly after the fire, the City of Santa Rosa posted notices on plaintiffs' mobile homes, stating:

> Prohibited Occupancy:
>
> The mobile home, recreational vehicle, accessory structure and/or building shall not be occupied until approved as complying with the provisions of State Law, California Health and Safety Code 18550 & 18871. Unlawful occupancy is a misdemeanor subject to arrest and prosecution pursuant to Health and Safety Code Section 18700 & 18874.

One month later, the Sonoma County health department sent a letter to plaintiffs regarding the park and the status of their mobile homes. The letter stated, in part:

> Subject: Confirmed Health and Safety Hazard (Lack of Electricity and Water/Substandard Housing) at [each plaintiff's address]
>
> The property is a mobile home park that was severely impacted by the recent wildfires, and the majority of homes were destroyed completely. Although some homes are still standing, the property reportedly is uninhabitable due to the following conditions:
>
>> Gas and electricity are not available on the property for any of the mobile home units. Potable water is not available on the property for any of the mobile home units. The property reportedly has no public septic/sewer connection due to damage to infrastructure.
>
> These conditions violate California Health and Safety Code, Section 17920.3 (a), (5), (6), (10), (14), (15), (j).

In January 2018, the California Department of Housing and Community Development issued an inspection report on the habitability of the mobile home park. Based on site inspections in November 2017 and January 2018, the report stated (Stip. Facts ¶ 16 Exh. 13):

3

> The Journey's End Mobile Home Park consisted of 160 lots. On October 9, 2017, a wildfire reached the park destroying 116 MH-Units. There are 44 MH-Units remaining in the park. These remaining units are uninhabitable due to the destruction of the park infrastructure. This was an extremely hot fire causing near total destruction of all park systems.
>
> Inspections revealed the existing gas and electrical systems as well as the new gas and electrical systems that were scheduled to be connected within days after the fire, were essentially rendered inoperable and all above ground utilities and equipment were destroyed. These systems are continuous throughout the park and it is not possible to isolate the utility systems to service existing homes. The electrical system must be replaced from the transformers onward and both the new and the legacy gas systems are contaminated with debris. Additionally, the mobile home park's private potable water system is also destroyed and the well is contaminated; the sewer system also suffered major damage and debris has entered the sewer piping blocking it in multiple locations.

A year later, the park owner requested permission from the City of Santa Rosa to close the park. In so doing, the owner prepared a relocation impact report. A city resolution adopted the report and approved the request in January 2020. Referencing the HCD report quoted above, the adopted relocation impact report stated, in part:

> In the months following the wildfire, HCD issued a report documenting the extent of the destruction to the Park and its infrastructure. In that report, HCD prohibited occupancy of the Park "until the Park infrastructure is rebuilt, replaced, or corrected." Subsequent to the HCD report, the State Water Resources Control Board determined that the on-site well that historically provided water to the mobile homes [could] no longer be used for domestic purposes and it was determined current plumbing codes will not allow the use of an above-ground water distribution system like the one that existed in the Park prior to the wildfire. As a result, no residents have resided in the Park in the more than two years since the wildfire occurred. Given the significant cost to construct a new water system connected to City water service, as well as restore the Park's sewer, gas, and electrical system, the Park Owner has concluded that it is not economically feasible to reopen the Park and it is, therefore, necessary to undertake the formal Park closure process.
>
> The remaining 44 mobile homes were assessed to determine their ability to be moved and to try to identify another mobile home park they could be relocated to. At the time of preparation of this Report, approximately five of the remaining 44 mobile homes have been removed from the Park for use in another location. However, based on their condition, the remaining mobile homes cannot be moved and, given their age, they are not likely to be accepted by another mobile home park.

Our plaintiffs' mobile homes are among the 39 that remained on the property. At oral argument, counsel explained that the homes have since been removed and destroyed.

Shortly after the fire, plaintiffs each made a claim for insurance benefits under their respective Foremost policies. "Among other things," Foremost paid each plaintiff the full policy limits under the "Additional Living Expenses" coverage benefits specified in Coverage D of the policies.

Plaintiffs requested that Foremost pay "total loss" benefits under the "Dwelling" coverage of the policies. Foremost ultimately declined to pay "total loss" benefits to plaintiffs. By letter, Foremost informed plaintiffs that it had determined that there had been no direct, sudden, and accidental physical loss to the dwellings, separate structures, or personal property of any plaintiff that had not already been paid for to the fullest extent permitted by the policy language. The letter also noted that the policies excluded loss of or to any property caused by, consisting of, or increased by the enforcement of any governmental requirement regulating the sale, confiscation, seizure, occupancy, relocation, or removal of plaintiffs' dwellings.

In October 2019, plaintiffs filed this action. Both sides now move for partial summary judgment.

This order follows full briefing and a telephonic hearing (due to the ongoing public health emergency).

**ANALYSIS**

Summary judgment is appropriate when there is no genuine dispute as to any material fact. A genuine dispute of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Under California law, applicable here, the interpretation of an insurance contract is a question of law. *See Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18 (1995). "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." *Bank of the West v. Sup. Court*, 2 Cal. 4th 1254, 1264 (1992). "If contractual language is clear and explicit, it governs." *Ibid.* In addition, "[t]he terms in an insurance policy must be read in context and in reference to the policy as a whole,

5

with each clause helping to interpret the other." *Sony Comput. Entm't Am. Inc. v. Am. Home Assurance Co.*, 532 F.3d 1007, 1012 (9th Cir. 2008) (citing Cal. Civ. Code § 1641; *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 867 (1993); *Palmer v. Truck Ins. Exch.*, 21 Cal. 4th 1109, 1115 (1999)). "[I]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." *Bank of the W.*, 2 Cal. 4th at 1264–65.

The cross motions address only one issue: whether plaintiffs are due "total loss" benefits under Coverage A of the Foremost policies. Coverage A insures the risk of "direct, sudden and accidental physical loss to the" insured property. Foremost argues that plaintiffs must, but cannot, show physical damage to the insured property, while plaintiffs argue that a physical loss may also be shown if the structure becomes uninhabitable or substantially unusable.

Foremost relies on *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.*, 187 Cal.App.4th 766, 779 (2010), which explained (citations omitted):

> A direct physical loss "contemplates an actual change in insured property then in a satisfactory state, occasioned by accident or other fortuitous event directly upon the property causing it to become unsatisfactory for future use or requiring that repairs be made to make it so." The word "direct" used in conjunction with the word "physical" indicates the change in the insured property must occur by the action of the fortuitous event triggering coverage. In this sense, "direct" means "'[w]ithout intervening persons, conditions, or agencies; immediate [.]'" For loss to be covered, there must be a "distinct, demonstrable, physical alteration" of the property.

According to the stipulated facts, "[t]he fire destroyed the electric, gas, sewer, and potable water infrastructure which served [p]laintiffs' ten mobile homes" (Stip. Facts ¶ 12). Put differently, "[a]s a direct result of the [f]ire, the insureds' homes lost access to running water, sewage, electricity, gas and heat" (Stip. Facts ¶ 13). A cold evening spent in one of these places without water and with sewage overflowing would quickly dispense with Foremost's assertion that no "tangible change" or "distinct, demonstrable, physical alteration" to the insured property occurred (Foremost Reply at 6). *MRI Healthcare*, 187 Cal. App. 4th at 779.

A difficulty for plaintiffs, however, is that the infrastructure destroyed by the fire belonged to the park owner (Stip. Facts ¶ 12). Plaintiffs respond to this point in a footnote (Pls. Reply at 8 n.5):

> While Foremost would like this Court to believe that damage to the mobile home park is not relevant to the issue of coverage, it plainly is. At least in part, the value of a mobile home is derived from the fact that it is located in a mobile home park. Here, Plaintiffs mobile homes could not be moved to another park because of their age and condition (Stip. Facts ¶ 24). Therefore, they were a total loss. Foremost issued the policy to mobile homeowners. It knew or should have known the risk it was underwriting.

This argument finds support in the record. The declarations page in each policy includes a table titled rating information that provides the "age of the dwelling" and answers whether it is in an "approved park" and "tied down," among other information. The next page contains a valuation of the insurance policy that explains that the amount of insurance for the structure "is based on an estimate of the cost to purchase a comparable replacement mobile home using specific information" the insureds provided (Stip. Facts Exh. 1 at 8).

Moreover, while the infrastructure belonged to the park, it physically interconnected with the units it serviced. The fire destroyed that infrastructure, such that the sewage, electricity, water, and gas did not physically run, as it previously had, in the unit itself. The fire directly, suddenly, and accidentally destroyed plaintiffs' homes by destroying the essential infrastructure for the entire park. Reading the "direct physical loss" term in context and in reference to the mobile-home insurance policies as a whole (as we must, *Sony*, 532 F.3d at 1012), this order finds plaintiffs have shown that the fire caused a "distinct, demonstrable, physical alteration" to the property, triggering coverage. *MRI Healthcare*, 187 Cal. App. 4th at 779. Although Foremost originally relied on a governmental action exclusion under the policy, its briefs abandon any argument on this point and raise no further exclusions.

Instead, Foremost argues that California law supports denying plaintiffs the benefits of their insurance policies. Not so. Foremost's reliance on *MRI Healthcare* is misplaced for the simple reason that the rainstorms at issue there did not directly cause any damage to the insured MRI machine. *MRI Healthcare*, 187 Cal. App. 4th at 780–82. The policy, similar to

here, covered "accidental direct physical loss" to insured property. As a result of spring storms, the roof of the building housing the MRI machine required repairs. These repairs could not be undertaken unless and until the MRI machine was demagnetized, or "ramped down." Once the machine was ramped down, it failed to ramp back up. This failure to ramp back up purportedly constituted "damage" to the MRI machine and resulted in lost income. *Id.* at 770.

The Court of Appeal found that the machine did not suffer any damage. The MRI technician used special tools to start the machine back up, but the tools used were external to the magnet itself. The technician ultimately ramped the machine back up merely by using a different combination of wires in the unit to open the superconductive switches in the machine. The repair costs and loss of income during the repairs did not constitute "physical loss" under the policy. As an additional, independent reason for upholding the denial of benefits, *MRI Healthcare* found that "[t]he ramping down of the MRI machine [had been] intentional, and the machine's failure to ramp back up was an expected, although unwelcome, result of the ramp down." The supposed loss had not been "accidental." *Id.* at 781.

Our plaintiffs do not seek to recover repair costs, loss of income, or even damages for their loss of use while they could not reside in their homes. Rather, plaintiffs seek to recover for the loss of their insured dwellings. As discussed, the fire caused a "distinct, demonstrable, physical alteration" to the insured dwellings. *MRI Healthcare*, 187 Cal. App. 4th at 779. While the infrastructure belonged to the park, it physically interconnected with the units it serviced. The fire destroyed that infrastructure, such that the sewage, electricity, water, and gas did not physically run, as it previously had, in the unit itself. Plaintiffs' homes were destroyed just as suddenly, just as directly, and just as accidentally as those immediately burned by the fire, for the fire destroyed the viability of the entire park.

Foremost also attempts to co-opt plaintiffs' authorities. In *Hughes v. Potomac Ins. Co. of District of Columbia*, 199 Cal. App. 2d 239, 248–49 (1962), a landslide swept away the subadjacent and lateral support essential to the stability of the insured dwelling. If one ignored

8

the fact that the landslide caused the house to overhang a cliff, the brick-and-mortar dwelling itself remained unaltered. Hewing to a practical interpretation of the policy, *Hughes* stated:

> To accept appellant's interpretation of its policy would be to conclude that a building which has been overturned or which has been placed in such a position as to overhang a steep cliff has not been "damaged" so long as its paint remains intact and its walls still adhere to one another. Despite the fact that a "dwelling building" might be rendered completely useless to its owners, appellant would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected. Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner. Respondents correctly point out that a "dwelling" or "dwelling building" connotes a place fit for occupancy, a safe place in which to dwell or live. It goes without question that respondents' "dwelling building" suffered real and severe damage when the soil beneath it slid away and left it overhanging a 30-foot cliff. Until such damage was repaired and the land beneath the building stabilized, the structure could scarcely be considered a "dwelling building" in the sense that rational persons would be content to reside there. We conclude that appellant's policy should and can be interpreted in such a manner as to cover the damage to respondents' "dwelling building" as a result of the landslide.

*Ibid.* How Foremost could find support in *Hughes* is a mystery. The supposed distinction Foremost offers is that the landslide constituted a physical alteration to the property, whereas the destruction of essential infrastructure that would transform a structure into a dwelling somehow does not constitute a physical alteration. This distinction substitutes fiction for reality. The utilities infrastructure physically interconnected with the units that it serviced. When the fire destroyed it, the sewage, electricity, water, and gas did not physically run, as it previously had, in the unit itself. Such constitutes an insured physical loss under the policy.

At the hearing, counsel for Foremost also argued that the policy separately covered loss of use, and that it paid out under that portion of the policy. While true, this argument is disingenuous at best. Coverage for "*additional* living expenses" was just that, additional. The relevant provision states:

> If an insured loss makes your premises not fit to live in, we will pay the actual, reasonable and necessary increase in your living expense to maintain your normal standard of living while you live elsewhere. We will pay for the shortest time needed:
>
> 1. To repair or replace the damaged property.

9

      2. For you to permanently relocate.

Nowhere in the policy does it state that Foremost would provide these *additional* living expenses for an insured loss *in place of* coverage for the insured loss itself. The provision clearly applied in addition to coverage for "direct, sudden and accidental physical loss to the" insured property. Again, it does not matter that the infrastructure belonged to someone else and the homes belonged to the victims. Plaintiffs' homes were destroyed just as suddenly, just as directly, and just as accidentally as those immediately burned by the fire, for the fire destroyed the viability of the entire park.

## CONCLUSION

These victims have suffered enough and Foremost has added to this suffering. To the extent stated herein, plaintiffs' motion for partial summary judgment is granted and Foremost's motion is denied. Judgment will be entered separately in accord with the parties' stipulation.

**IT IS SO ORDERED.**

Dated: December 4, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE